(21 App. Div. 77.)

### JOHNSTONE v. O'CONNOR.

(Supreme Court, Appellate Division, Second Department. October 5, 1897.)

1. PARTITION SALES—PURCHASE BY ATTORNEY—RIGHTS OF PRINCIPAL.

O. died intestate, seised of certain real property, and leaving a widow and five children, including plaintiff and defendant. Defendant brought an action for partition, in which he acted in reality as the attorney and adviser of his mother and plaintiff and E., another sister, and received the allowance for services made by the court to the attorney who nominally represented them on the record. His mother and sisters also relied upon him to act as their adviser and manager, and he voluntarily assumed that position. At the foreclosure sale, in February, 1885, he bought the property for himself, without leave of court. *Held* that, as against them, he was precluded from retaining the property.

2. SAME—INTEREST OF HEIRS.

In an action to establish the rights of plaintiff in the purchase, as having been made for joint benefit, it appeared that the sister E. had died, devising and bequeathing to plaintiff all her real and personal property, and that the mother also had died. *Held*, that plaintiff's right to elect to claim the benefit applied to two undivided fifths.

**3. SAME—REPUDIATION OF SALE—ELECTION.**

Shortly after the sale, plaintiff, her mother, and E. became well aware of the facts. They were all of full age and under no disability. Thereafter, and while receiving the advice of independent counsel, plaintiff accepted her share of the proceeds, with knowledge of their source. At that time, and through her dissatisfaction at the amount of the proceeds, the relation of confidence existing between plaintiff and defendant had been dissolved. She received the proceeds only after delay and consideration. *Held*, that her course constituted an election not to repudiate the sale.

**4. SAME—TIME FOR ELECTION.**

Defendant told plaintiff he was willing to have her come in with him on the purchase. She neither accepted nor declined. Again, several months later he made her a formal offer in writing to the same effect, limiting her acceptance to one week. She declined, in writing, to consider it. She then had the advice of able and disinterested counsel. She never asked for more time to consider the proposition, and thereafter and for more than four years absolutely refused to consider it. *Held*, that her right to claim the benefit of the purchase was lost by lapse of a reasonable time within which to elect.

**5. SAME—SPECULATIVE DELAYS.**

At the purchase, defendant borrowed, by mortgage on the land, the greater part of the purchase money, but applied $40,000 towards it, which was deducted from his share of the purchase money. If plaintiff had elected to share in the benefit, she was thus bound to pay defendant her pro rata share of this sum. *Held*, that she could not retain this amount for six years, cast on defendant the burden of carrying the property, and then elect to share profits if the land appreciated or avoid loss if it diminished in value.

Appeal from judgment on report of referee.

Action by Ruth A. Johnstone against Eugene F. O'Connor to declare a purchase made by defendant at partition sale to be a joint purchase, for the benefit of plaintiff and others as well as himself. From a judgment for defendant, entered on a decision of the referee, plaintiff appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

John L. Hill and William D. Veeder, for appellant.

Edward C. Boardman, for respondent.

CULLEN, J. On the 21st day of November, 1883, one Owen O'Connor died, intestate, seised of several pieces of real estate situate in the city of New York, worth more than half a million of dollars. He left, him surviving, a widow and five children,—the plaintiff, Ruth (then unmarried), Mary, Josephine Slattery, James O'Connor, and the defendant, Eugene O'Connor. Letters of administration on the estate of the deceased were issued to the widow. Her application for the letters was resisted by her daughter Josephine Slattery, who appeared by counsel. There appears to have been some antagonism between this daughter, on one side, and her mother and her two sisters, Mary and Ruth, on the other. These latter formed the immediate family of the deceased at the time of his death. Shortly after the application for letters of administration, the defendant instituted an action for a partition of the real estate. The defendant was a lawyer, having been admitted to the bar some years previous to this time. The action was first brought by another person as attorney, and subse-

quently the defendant was substituted in his place. In that action Josephine Slattery appeared by attorney, and James O'Connor appeared in person, he also being a lawyer. The plaintiff, her mother, and her sister Mary were served with process, but for some time did not appear, and were in default. Subsequently an appearance was entered on their behalf by James A. Brady, who waived notice of further proceedings except notice of sale. The action proceeded to judgment; and on the 15th day of February, 1885, the realty sought to be partitioned was sold for an aggregate sum of $615,750, the defendant becoming the purchaser at that sale. On the 4th day of June a deed of the property was executed and delivered to him, and since that time he has remained in possession thereof, except a parcel subsequently sold by him. The widow, Catharine A. O'Connor, died, intestate, on the 23d day of July, 1885; and on the 15th day of February, 1886, Mary E. O'Connor died, leaving a will, by which she devised and bequeathed to her sister, the plaintiff, all her real and personal property. In October, 1891, the plaintiff brought this action to have it declared that the purchase made by the defendant at the partition sale was a joint purchase for the benefit of herself, her mother, and her sister Mary, to whose rights she had succeeded. She further asked that the plaintiff be directed to account to her for her share in the rents and profits of the realty since he took possession thereof, and in the purchase price of any property which he might have sold. The referee rendered a decision herein, as now authorized by the Code, which did not state separately the facts or the propositions of law found by him. This court is therefore required to review all questions of fact and law, and to award either party such judgment as he may be entitled to. New Britain Nat. Bank v. Cleveland Co., 91 Hun, 447, 36 N. Y. Supp. 387; Ross v. Caywood, 16 App. Div. 591, 44 N. Y. Supp. 985.

The learned referee decided this case on the ground "that the defendant did not sustain any such fiduciary relation or relation of trust and confidence towards the plaintiff and his mother and his sister Mary, in the matter of a partition and sale of the real estate, as would charge him as trustee for himself and the plaintiff with the property purchased." In this conclusion of the referee we do not wholly concur. The theory on which the plaintiff sought to establish the trust proceeded on three grounds: First, that the defendant promised the plaintiff, her mother and sister, to purchase at the sale on their behalf, as well as his own; second, that he was guilty of fraud in his conduct in reference to the suit, and his purchase at the sale under the judgment in that suit; third, that his relations to the plaintiff, her mother and sister, were of such trust and confidence that he was debarred from purchasing at the sale exclusively on his own behalf, and that they had the right to elect to take advantage of such purchase.

As to the first ground, we are entirely clear that the evidence fails to establish any such promise as is claimed, and, on the contrary, entirely negatives its existence. No direct promise by the defendant that he would purchase at the sale for the benefit of himself and his sisters and mother is shown; but it is attempted to be spelled out of

various conversations had by him with those parties. These desultory conversations are not susceptible of the interpretation claimed for them. But it is unnecessary to review the evidence at length, for one conceded fact shows that the plaintiff and her sister and mother did not contemplate any purchase being made on their behalf. On February 20, 1885, before the sale, the defendant wrote his mother:

"We sell the real estate on Thursday next, the 26th instant, at the exchange, New York. I have advertised very extensively, and hope we may realize good prices. * * * I presume mother would prefer to get her money outright, instead of leaving her dower invested."

The sale took place a few days later. The plaintiff was very much dissatisfied at the result. She expected the property would realize $1,000,000, instead of $600,000. This dissatisfaction was so great that it immediately caused a rupture in the relations between the defendant and his mother and sisters. This is testified to by the plaintiff, and stands without dispute. It is absolutely inconsistent with a promise on his part to purchase on behalf of the others, or an expectation on their part that he should do so. If there had been such a promise, even made conditionally in case the property did not bring a fair price, there could be no possible ground of feeling against or dissatisfaction with the defendant. In such case he would have done exactly what he had agreed to do; and, the more cheaply the property sold, the more advantageous it would be to the parties who were to share in the purchase.

Nor do we think the defendant was guilty of any fraud in the conduct of the partition suit, or of the sale had therein. Great pains seem to have been taken to thoroughly advertise and make known the sale. The defendant did all that he could to have the property bring good prices. That the sale itself was conducted with absolute fairness is proved by the testimony of the referee, a lawyer of great experience in matters of real estate, and of high professional position. In fact, I do not know that anything is suggested or shown to have been done or to have been omitted by the defendant which would have conduced to a realization of higher prices for the property.

But though the plaintiff had made no express promise to purchase the property on behalf of his mother and sisters, as well as his own, and though he was not guilty of any actual fraud, I am of opinion that his relations to his mother and sisters were such as precluded him from holding the title acquired by him at the partition sale in hostility to them. I think it is certain and beyond substantial cavil or doubt that in the partition suit the defendant acted as the real attorney and adviser of his mother and sisters. Here, again, it is not worth while to go through the various statements of the plaintiff and defendant in reference to what passed in previous conversations between the parties, for one fact settles the whole question. On February 9, 1885, the defendant wrote:

"My Dear Mother and Sister: * * * Being the plaintiff and plaintiff's attorney, I could not appear on paper for you or Ruth; so I had Brady appear to represent you, so that, whenever McClure's firm was rampant, I am in a position to squelch him or them. So now I have done Brady's work, and McClure's allowance must be divided with Brady, and he turns it over to me, and makes no charge against you or anybody."

As matter of fact, an allowance was made to Brady as attorney for the present plaintiff, her sister, and her mother, and that allowance was turned over, in whole or part, by Brady to the defendant. This money did not proceed from bounty or generosity of the court. It was paid out of the property of these ladies, and was paid for services in protecting their interest in the suit. The case would have been in no wise different had they paid the defendant personally out of their funds. As the defendant was paid by his mother and sisters for legal services in the action, I am at a loss to see why he was not bound to render to them the same skill, fidelity, and loyalty that is due from every lawyer to his client. There are exceptions, but, as a rule, the best test of whose employment a lawyer or other person is in is, who pays him? Besides the relation of attorney and client, there existed between the defendant and his mother and sisters the further relation of trust and confidence, which proceeded not only from the family ties, but also from the fact that they relied upon him to act as their adviser and manager, and he voluntarily assumed that position. "When a trustee, administrator, agent, or other fiduciary person, without the knowledge or consent of his beneficiary, purchases the trust property at a public or private sale, * * * in these and all similar cases equity impresses a constructive trust upon the property purchased or obtained, and upon the profits and acquisitions so made, for the benefit of the party beneficially entitled." Pom. Eq. Jur. § 1052. It is immaterial whether the purchase is made in good faith, or whether the price paid is a fair one. So, where an attorney buys land at an execution sale in favor of his client, he must hold the land as trustee. Perry, Trusts, § 205. "A court of equity, from the mere fact of such relation [attorney and client], would fasten upon the purchase a trust, without making any inquiry into the motives or intentions of the attorney in making the purchase, and compel him to give up its benefits and advantages on a reimbursement of the purchase money." Stockton v. Ford, 11 How. 232. Nor is it material that the defendant in this action had his own interest in the partition suit to protect. For the protection of that interest, he might purchase, provided he obtained an order of the court permitting him so to do, made on personal notice to his clients; but such permission was a prerequisite to the validity of the purchase. Scholle v. Scholle, 101 N. Y. 167, 4 N. E. 334. It is probable, also, that in this case the defendant could have accomplished the same result by withdrawing from his relation as attorney and adviser before the sale, and placing his client in the hands of some other counsel, who could have protected their rights. Such counsel could, and probably would, have advised his clients that they might bid on the sale; that, under the terms of the decree, their shares of the proceeds of sale could be applied to the purchase without advancing other funds; and that thus they would, at least, be able to purchase some of the property, if it was sacrificed at the sale, and protect their interests. No such advice was given by the defendant, who at the sale sought only his own advantage.

But though we think the plaintiff might have elected to claim the benefit of the defendant's purchase (to the extent of two undivided

fifths, in our opinion, not to the extent of two thirds, the former being the extent of the interest of herself and her sister before the sale), we think she has now no such right. She concedes that a few days after the sale, and long before the deed was given or she received her share of the proceeds of the sale, her mother, her sister, and herself were well aware that the defendant had purchased the property in his own behalf. With this knowledge she accepted her share of the proceeds, and she states that she knew the source from which the payment proceeded. All these ladies were of full age, and suffering under no disability.

In Boerum v. Schenck, 41 N. Y. 182, it was held that an unqualified acceptance of the proceeds of sale, with knowledge, was an affirmance of the sale. It was there said, per Woodruff, J.:

"It is not necessary to deny, nor do I think it can be truthfully denied, that an acceptance by the beneficiary of the proceeds of a sale, made by a trustee or donee of a property indirectly to himself, may operate as an affirmance of the sale, and, as such, may conclude the beneficiary. The beneficiary might consent to such sale before it was made, and there is no legal or equitable objection to his or her affirmance thereof afterwards."

At the time of her receipt of the fund, the relation of confidence and of trust existing between the plaintiff and the defendant had been dissolved. The dissatisfaction at the amount realized at the sale had produced this result. The evidence tends to show that at the time of taking the money, and before, the plaintiff was receiving the advice of Col. Johnson, a lawyer in the city of Brooklyn. The correspondence between her and the referee who made the sale shows that the money was received only after delay and consideration. The purchase by the defendant was not void. It was only voidable, at the election of his client. The plaintiff had her option. If she was satisfied with the sale, she could take its proceeds. If she was dissatisfied, she could repudiate it. But she could not do both. When she took the proceeds, that necessarily determined her election. There was no necessity for a conveyance from her. The legal title passed to the defendant. The purchase was not void ab origine, but voidable only. Harrington v. Bank, 101 N. Y. 257, 4 N. E. 346.

There is another feature in this case which, I think, destroys any claim of the plaintiff to any special equitable consideration, if it does not bar her right to equitable relief. In the early spring of 1886, shortly after the death of her sister, she had a conversation with the defendant. She testified that he stated:

"He was willing that I should, as he said, come in with him on the property that he bought,—the real estate of my father. I neither accepted nor declined. He said he would make me the same offer he had made to mother and Mary, to come with him on the property; and I said that he was making me the offer, but he had never made it to mother and Mary. I told him that."

On September 27th of that year, the defendant caused the following letter to be sent from his attorney to the plaintiff:

"Madam: Your brother Eugene F. O'Connor, having heretofore offered to allow you to become joint owner with him in the real estate formerly owned by your father, and purchased by your brother at the sale of the same at public auction, directs me to state that he hereby renews the offer above men-

tioned, and gives you the whole of this week to accept it; and, in case he is not informed of your acceptance within the time stated, he will consider that you decline to accept his offer. I am
"Yours, very truly,                          James A. Brady."

To this offer, on October 2d, the plaintiff made the following reply:

"James A. Brady, Esq.—Sir: In reply to your communication of September 27th, I have only to say, as there are various matters as yet unsettled, and several subjects engrossing my attention, I deem it advisable not to take any other matter under consideration for the present.
"Yours, very truly,                          Ruth A. O'Connor."

From that time no further conversations or communications concerning the property took place between the parties until February 14, 1891, when the plaintiff's lawyer wrote to the defendant, stating the plaintiff's claim. It appears that, immediately after the death of her, sister, the plaintiff had retained as her adviser one of her present counsel in this action; so that both in the spring of 1886, when the defendant orally offered to allow her to share in the purchase of the property, and also in the fall of that year, when he renewed the offer by the letter of his attorney, the plaintiff had advice of able and disinterested counsel. She must have been fully advised of her rights, or could readily have been informed of them had she sought advice. She deliberately refused to consider or take action on this offer for a period of over four years from the time it was made, and of nearly six years from the time of the sale.

In some of the cases it is debated whether lapse of time less than that prescribed by that of the statute of limitations would bar an action by a cestui que trust to avoid a purchase made by the trustee. The question arose in Boerum v. Schenck, supra, but the court found it unnecessary to decide it, or even to discuss it at any length. It is to be borne in mind that this case differs materially from the Schenck Case, and from most of the cases found in the books. In those cases the trustee denied the right of the beneficiary to avoid the sale or share in the purchase. On the denial of that right the cause of action of the cestui que trust was complete, and it might well be held that then nothing would bar the action except the statute of limitations. But here the defendant did not deny the right of the plaintiff to claim the benefit of the purchase. On the contrary, he made an express offer giving her that option. So, the question here is not whether the action is barred by lapse of time or laches, but what time had the plaintiff, after offer made, in which to make an election? On this question I cannot see that the statute of limitations is controlling, or even at all applicable. Conceding to its fullest extent the equitable rule that a purchase by a trustee or a person holding fiduciary relations is absolutely voidable at the election of the cestui que trust, I should think it wholly unfair, when the trustee acknowledges the rights of the cestui que trust, and calls upon her to make her election, that the cestui que trust should have the whole period prescribed by the statute of limitations (either 10 or 20 years) in which to make such election, and thus during this period speculate on a rise or fall of the property. Certainly, this would be making a rule of equity work the grossest inequity. The cestui que trust, where her rights are acknowl-

edged, should have a reasonable time in which to determine her election, but no more.

In Follansbe v. Kilbreth, 17 Ill. 522, the defendant, as the agent of the plaintiff, purchased property, and took the contract in his own name. After being aware of the conduct of their agent, they failed to make any more payments on the contract of purchase, and waited for some five years before bringing an action to have the purchase declared for their benefit. It was held that this lapse of time barred their right to relief. It was there said:

"Granting to the complainants the right to repudiate this purchase, and throw it upon the hands of the defendant, for any cause, he had a right to know whether they would avail themselves of that right as soon as they discovered the facts which conferred upon them that right, and had investigated or had a reasonable time to investigate the facts by which their election to affirm or disaffirm his acts was to be controlled. They had no right to hold him in suspense, while they could take the chances of the fluctuations in the value of the land. * * * This speculative disposition is as repulsive to a court of equity in a cestui que trust towards his trustee as in a purchaser towards his vendor. * * * Admitting that Follansbe had paid too high a price for the land, fraudulently and for his own advantage, as charged in the bill, there was still some limit to the extent of their rights; nor was he deprived of all his. The greatest malefactor has rights which courts of justice will protect; and the defendant, admitting the truth of all that is charged against him, is not in a worse condition. He was not entirely at the mercy of the complainants. They were bound, in a reasonable time, to decide definitely whether they would adopt or repudiate his acts; and, having decided, they were bound by it."

The case of Wade v. Pettibone, 11 Ohio, 57, was quite similar to the one before us. There the attorney for a creditor purchased the land sold on an execution which he had issued. It was held that the creditor could claim the benefit of the purchase; but it was also held that he must assert his right within a reasonable time, and that a delay of two years in the acceptance of an offer made by the attorney to relinquish his purchase was unreasonable, and that the client thereafter could not elect to take the land.

We think that the principle of the cases cited is entirely applicable to the present one. If there was any infirmity in the ratification of the sale by the plaintiff's accepting her share of the proceeds, either because at that time it may be surmised she had not wholly determined her relations with the defendant, or because she was ignorant of her rights, certainly after the offer by the defendant she was bound to take action in the matter. When the oral offer was made to her, a year had elapsed since the sale; when the written offer was made, eighteen months. We do not say that the defendant could have limited the plaintiff's time to make an election to the week specified in the letter of his attorney; but the plaintiff, in answer, asked for no more time. She simply declined to consider the matter. Hence, after the expiration of a reasonable time, her right to claim the benefit of the purchase was lost. It is true that the defendant succeeded in borrowing, by mortgage on the land, the greatest part of the purchase money; but still he had to apply towards the purchase over $40,000, which was deducted by the referee from the amount which was coming to defendant from the sale. The fact that the defendant was able to borrow this large sum did not prejudice the plaintiff. On the con-

trary, it was advantageous to her; for, in taking the benefit of the purchase, she would have so much less a sum to advance from her own funds. If she was entitled to the benefit of the purchase to the extent of two-thirds, as her counsel claims, she was bound to pay to the defendant about $28,000. She could not retain this sum for six years, and cast on the defendant the whole burden of carrying the property; she to share in any profit if the land appreciated, and to avoid any loss in case the land diminished in value.

The judgment appealed from should be affirmed, with costs. All concur.

